Shawn Lynn SILLS, Appellant
(Defendant below),

v.

STATE of Indiana, Appellee
(Plaintiff below).

No. 982S336.

Supreme Court of Indiana.

May 14, 1984.

Rehearing Denied July 10, 1984.

Stephen J. Michael, John W. Bailey, Donna Redding, Huntington, for appellant.

Linley E. Pearson, Atty. Gen., Michael Gene Worden, Deputy Atty. Gen., Indianapolis, for appellee.

HUNTER, Justice.

The defendant, Shawn Lynn Sills, was convicted of murder, Ind.Code § 35-42-1-1 (Burns 1979 Repl.). The defendant was sentenced to a term of forty years, with twenty years added for aggravating circumstances. The defendant raises the following eight issues in this direct appeal:

1. Whether the trial court erred in denying the defendant's motion to suppress his confession and by allowing the introduction into evidence of a tape recording of the confession;

2. Whether the trial court erred in denying the defendant's motion to withdraw his plea of not guilty and by denying defendant's motion to present evidence before the state had presented its case;

3. Whether the trial court erred in denying the defendant's motion for a change of venue;

4. Whether the trial court erred by admitting into evidence and displaying to the jury certain photographs of the victim;

5. Whether the trial court erred by admitting into evidence a "sexual assault kit";

6. Whether the trial court erred by admitting into evidence certain diagnostic reports;

7. Whether the trial court erred when it failed to read to the jury seven of the defendant's instructions; and

8. Whether the sixty-year sentence was manifestly unreasonable.

The facts most favorable to the state show that the defendant was arrested for the murder of Mary Haines, an eighty-two year old woman. The defendant, then sixteen years old, entered the victim's house, found her sitting on the floor, and beat her to death with his fists.

I.

Shortly after his arrest on September 9, 1981, the defendant was taken to an interrogation room. Present at this time were Officer Jim Walters and Sheriff Ray Williams. The defendant's father, George Sills, arrived about fifteen minutes later. The defendant and his father were advised of their *Miranda* rights and both indicated they understood. The defendant then signed a written waiver of rights form and the father signed as a witness. Walters and Williams began questioning the defendant. A few minutes later, the defendant and his father conferred privately, during which time the father urged the defendant to tell the truth. After five minutes, the father summoned Walters and Williams and indicated his son was ready to talk. The defendant and his father were again advised of their constitutional rights. The defendant then began to discuss the events surrounding the murder. The officers asked the defendant to repeat those statements; this time the statements were tape-recorded. The defendant was again advised of his rights before giving the taped statements.

As noted above, the defendant was a juvenile at the time of his arrest and inter-

rogation. Under Ind.Code § 31-6-7-3 (Burns 1980 Repl.):

"(a) Any rights guaranteed to the child under the Constitution of the United States, the Constitution of Indiana, or any other law may be waived only:

"(1) by counsel retained or appointed to represent the child, if the child knowingly and voluntarily joins with the waiver; or

"(2) by the child's custodial parent, guardian, custodian, or guardian ad litem if:

"(A) that person knowingly and voluntarily waives the right;

"(B) that person has no interest adverse to the child;

"(C) meaningful consultation has occurred between that person and the child; and

"(D) the child knowingly and voluntarily joins with the waiver."

This statute is essentially a codification of our holding in *Lewis v. State*, (1972) 259 Ind. 431, 288 N.E.2d 138. The code, however, significantly changed our holding in *Lewis* in one way. Whereas we stated in *Lewis* that a child could, by himself, waive his constitutional rights, the code prohibits unilateral waiver by the child. Instead, only an attorney or a custodial parent can waive the child's rights. The defendant contends that, since he signed the waiver form and his father signed only as a witness, the requirements of Ind.Code § 31-6-7-3 were not met. In support of this argument, he cites *Deckard v. State*, (1981) Ind.App., 425 N.E.2d 256.

■ In *Deckard*, the Court of Appeals dealt with the situation where the parent was present when the juvenile signed the waiver, but did not herself sign. The court held that "there is nothing from the face of the waiver to establish that [the juvenile's] mother knowingly and intelligently waived his rights." *Id.*, 425 N.E.2d at 257. The concern in *Deckard* was whether there was a knowing and intelligent waiver of rights by the parent. No particular form is required to establish such a waiver. *Powell v. State*, (1982) Ind., 437 N.E.2d 969.

There must, however, be sufficient evidence to establish that the parent and child joined in the waiver. In *Deckard*, the evidence was insufficient since the waiver was signed only by the child, thus preventing the Court of Appeals from determining whether the parent waived the rights. Here, the evidence does establish that the parent joined in the waiver. The father signed the waiver form, albeit on a line designated as "witness." In addition, the father testified at the hearing on the motion to suppress that he did not object to his son giving statements to the officers and, in fact, encouraged him to do so. The facts, taken as a whole, establish that the father and the defendant joined in the waiver and that the father knowingly and voluntarily waived his son's rights. As such, there was no unilateral waiver by the defendant.

The defendant also asserts that, even if the tape recording should not be suppressed pursuant to *Deckard*, it must be suppressed under *Miranda v. Arizona*, (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. The defendant contends the interrogating officers continued to question him after he requested a lawyer. The record reflects a sharp discrepancy in the evidence. The defendant testified that he asked for an attorney three times and that each time the officers continued questioning. The defendant's father recalled the defendant asking for a lawyer twice. Sheriff Williams testified that the defendant asked for an attorney only once and that questioning then ceased. Williams further testified that the defendant was then allowed to talk alone with his father. After this brief conversation, the father requested that the questioning be resumed. The defendant was given his rights again, and the questioning resumed with the result being that the defendant gave the challenged incriminating statement.

■ The evidence on this issue is conflicting. As such, only that evidence which tends to support the trial court's ruling can be considered on appeal. *Chandler v. State*, (1981) Ind., 419 N.E.2d 142. We

cannot weigh the evidence nor judge the credibility of witnesses. *Chandler v. State.*

■ The admissibility of defendant's challenged incriminating statement is governed most closely by the post-*Miranda* case of *Edwards v. Arizona,* (1981) 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378. There the United States Supreme Court stated:

"[W]e ... hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."

451 U.S. at 484–85, 101 S.Ct. at 1884–85, 68 L.Ed.2d at 386. *Cf. Romine v. State,* (1983) Ind., 455 N.E.2d 911; *Bryan v. State,* (1982) Ind., 438 N.E.2d 709. Here there is proof that the resumption of interrogation was not "police-initiated," but instead was initiated through a communication to interrogators by the father after consultation with the defendant. The defendant was then given a new *Miranda* advisément and responded without resistance to the renewed questioning. *Edwards* requires resumption to be initiated by the accused himself. It is certainly rational and we believe consistent with *Edwards* to regard the father here as the spokesman for both father and son who communicated their joint decision to the interrogators. Since there was substantial evidence of probative value to support the trial court's decision that the statements were given in compliance with *Miranda,* we cannot now disturb the ruling. Thus, for the reasons set forth above, the trial court did not err in denying the motion to suppress or in allowing the tape-recorded statements into evidence.

## II.

The defendant next contends that the trial court erred in denying his motion to withdraw his plea of not guilty and in denying the defendant's "Motion to Present Evidence First and Open and Close Argument." The defendant asserts that by withdrawing his plea of not guilty, he was attempting to proceed solely on theories of not guilty by reason of intoxication and not guilty by reason of insanity. The defendant argues that since he bears the burden of proof on these issues, he should have been allowed to open and close the case.

■ At the time of this trial, our statute on motions to withdraw stated:

"The court may allow the defendant to withdraw his plea of not guilty for good cause shown. A motion to withdraw a plea of not guilty shall be in writing and shall state facts showing the reason why such plea should be withdrawn and in what respect the substantial rights of the defendant will be prejudiced if the motion is denied. The motion shall be verified and the state may file counter-affidavits in opposition to the motion. The ruling of the court on the motion shall be reviewable on appeal only for an abuse of discretion."

Ind.Code § 35-4.1-1-6(a) (Burns 1979 Repl.) (repealed by 1981 Acts, P.L. 298). The trial court did not exceed its discretionary power to deny the motion. The defendant's motion contained an admission of guilt; yet the defendant continued to allege he was not guilty by reason of intoxication. Voluntary intoxication is a *defense.* Ind. Code § 35-41-3-5(b) (Burns 1983 Supp.). A defendant asserting intoxication is still pleading not guilty. The trial judge could reasonably have surmised that allowing the defendant to profess his guilt yet plead not guilty by reason of intoxication would confuse the jury. Furthermore, it has been held that it is impossible to both confess guilt and assert an insanity defense, since

the *mens rea* element of a crime and the sanity of the defendant are considered in the same, rather than a bifurcated, trial. *Mingle v. State,* (1979) Ind.App., 396 N.E.2d 399. There was no error in refusing to allow the motion to withdraw the not guilty plea.

■ We also hold that there was no error in refusing to grant defendant's "Motion to Present Evidence First and Open and Close Argument." Under the statute in effect at the time of this trial, the state offers its evidence first, "and the defendant shall then offer the evidence in support of his defense." Ind.Code § 35-1-35-1 (Burns 1979 Repl.) (repealed by 1981 Acts, P.L. 298). Further, the statute provided that the state shall have the opening and closing of the argument. *Id.* These rules of trial procedure were not and are not changed by the fact that a defendant raises the insanity defense. The defendant contends that insanity proceedings are civil in nature, and therefore, since the defendant bears the burden of proof, he should be allowed to open and close and to present evidence first. It is true that the burden of proof in insanity proceedings is the civil standard rather than the criminal. But this does not talismanically transform the entire criminal proceeding into a civil one. Insanity is a defense and defenses are offered after the state has offered evidence to support the prosecution. Ind.Code § 35-1-35-1 (Burns 1979 Repl.) (repealed by 1981 Acts, P.L. 298). There is no error.

### III.

■ The defendant next contends the trial court erred by denying his motion for a change of venue. The basis for this motion was that the defendant believed that pretrial publicity on the murder was so intensive that it deprived the defendant of the opportunity for a fair trial.

In order for us to reverse the trial court's decision to deny the motion, the defendant is required to show that there was adverse publicity and that the jurors were unable to set aside their preconceived notions of guilt and render a verdict based on the evidence. *Sage v. State,* (1981) Ind., 419 N.E.2d 1286; *Pine v. State,* (1980) Ind., 408 N.E.2d 1271. A review of the examples of pretrial publicity here shows little more than the reporting of the facts surrounding the case. More importantly, however, we note that nothing in the record reflects any juror prejudice, since there was no transcript of the voir dire examination. Therefore, there is no basis for finding that the trial court erred in denying the defendant's motion. *Sage v. State.*

### IV.

The defendant next contends that state's exhibits 4 and 6 were improperly admitted into evidence. These exhibits were black and white photographs depicting the nude body of the victim. The photographs were taken at the scene of the murder. The defendant asserts the photographs were cumulative, redundant and gruesome and, therefore, should not have been allowed into evidence.

■ The admission of photographic evidence is generally within the discretion of the trial court, reviewable only if the trial judge exceeds his discretionary power. *Wilson v. State,* (1978) 268 Ind. 112, 374 N.E.2d 45. Photographs are not necessarily inadmissible on the ground that they are gruesome and cumulative, *Chittenden v. State,* (1982) Ind., 436 N.E.2d 86; *Bates v. State,* (1977) 267 Ind. 8, 366 N.E.2d 659, and the fact that a photograph might arouse the jury is not itself sufficient to exclude it from the evidence if the photograph is material and relevant. *Porter v. State,* (1979) 271 Ind. 180, 391 N.E.2d 801.

■ Although the photographs in question were undoubtedly gruesome, we find that they were properly admitted. The photographs depicted the victim as she was found in her house. They were relevant to show the crime scene and the position of the victim. *Drollinger v. State,* (1980) Ind., 408 N.E.2d 1228. The pictures showed the victim from different angles and were not redundant of other photographs that were admitted. They were

probative of the nature and extent of the victim's wounds. *Drollinger v. State.* We find that the trial judge did not exceed his discretionary power to admit these two photographs.

## V.

■ The defendant next contends the trial court erred in admitting into evidence state's exhibit 12, a "sexual assault kit." This exhibit was offered during the testimony of Thomas Malone, a field technician for the Indiana State Police. Malone was present during the victim's autopsy and placed samples of the victim's blood in the sexual assault kit. Both the blood and the kit were admitted into evidence.

At trial, the defendant objected to the introduction of the sexual assault kit. The objection at this time was that the kit was inflammatory; no further grounds were given for the objection. On appeal, however, the defendant contends the kit was inadmissible on the ground that it could only be considered by the jury of evidence of another crime, such as sexual assault or rape. Objections to the admission of evidence must be based on specific, rather than general, grounds. *Brown v. State,* (1981) Ind., 417 N.E.2d 333. The defendant cannot change or add to his objections in the reviewing court. *Lucas v. State,* (1980) Ind., 413 N.E.2d 578; *Cooper v. State,* (1972) 259 Ind. 107, 284 N.E.2d 799. The error is therefore normally waived. We also note that any error on the nebulous ground that the kit was inflammatory was rendered harmless by the subsequent admission without objection of an autopsy report containing a reference to the rape of the victim. As we stated in *Badelle v. State,* (1982) Ind., 434 N.E.2d 872, "[a]ny error in the admission of evidence is harmless when other evidence having the same probative value is admitted without objection and is not refuted." *Id.,* 434 N.E.2d at 875. There is no reversible error.

## VI.

The defendant next contends the trial court erred in admitting state's exhibits numbered 20, 21, and 22. These exhibits were introduced over the defendant's objections during the testimony of Dr. Norman Duly, a psychiatrist, who testified during the state's rebuttal on the insanity defense. Exhibit 20 was an electroencephalograph evaluation prepared by Dr. Webb. Exhibit 21 was a diagnostic evaluation of the defendant prepared before he entered the Indiana Boys' School in 1980. Exhibit 22 was a copy of psychological and intelligence tests administered to the defendant as part of his evaluation before admission to the Boys' School. None of the individuals who prepared the reports testified at trial. The defendant objected to the introduction of these exhibits on the ground that they were hearsay.

■ Hearsay is defined in our state as an extrajudicial declaration of another offered to prove the truth of the facts asserted therein, and thus resting on the credibility of declarant who is not in court and available for cross-examination. *Roberts v. State,* (1978) 268 Ind. 348, 375 N.E.2d 215. A review of the record in this case shows that the three exhibits were not being offered for the truth of the matters contained in them. Rather, they were being offered to establish the foundation of Dr. Duly's diagnosis. Before each exhibit was offered into evidence, Dr. Duly was asked if it constituted material that he considered or relied upon in his evaluation of the defendant. No attempt was made to assert that the facts contained in the exhibits were true. While it might have been better not to have admitted these documents directly into evidence, *see Smith v. State,* (1972) 259 Ind. 187, 285 N.E.2d 275, it was not necessarily an error to do so. The portrayal of the defendant in exhibits 21 and 22 is almost identical in substance to that produced before the jury by the defendant's own psychiatric witnesses, who regarded the defendant as being legally insane. The exhibits described the defendant as having an angry and hateful attitude, and to a large extent they undermined Dr. Duly's opinion that the defendant was sane at the time of the killing. In

short, the trial judge has wide discretion in the admission of evidence. Under the circumstances of this case, we cannot say that the trial judge exceeded his discretion in allowing the state to admit these exhibits.

### VII.

The defendant next contends that the trial court erred when it refused defendant's tendered instructions numbered 1, 5, 6, 7, 8, 9, and 11.

■■ Defendant's tendered instruction number 1 dealt with the defense of insanity. The defendant asserts that by refusing this instruction the trial court confused the jury since they were purportedly left without a standard to determine whether the defendant was insane. An examination of the record, however, shows that the jury was provided with the proper standard. Preliminary instruction number 11, reread to the jury at the conclusion of the case stated:

> "The Defendant has imposed a defense of insanity.
>
> "Insanity may be a defense to the crime charged. The legal defense of insanity is defined as follows:
>
> "A person is not responsible for criminal conduct if at the time of such conduct as the result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.
>
> "The terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct."

The substance of the refused instruction was contained in preliminary instruction number 11. The trial court, therefore, did not err in refusing to give defendant's tendered instruction number 1. *Davis v. State*, (1976) 265 Ind. 476, 355 N.E.2d 836; *Hash v. State*, (1972) 258 Ind. 692, 284 N.E.2d 770.

Defendant's tendered instruction number 5 concerned involuntary manslaughter. The defendant argues that involuntary manslaughter was a lesser included offense of murder and that he was therefore entitled to an instruction on the offense. The defendant further argues that since the commission of battery is a necessary element of involuntary manslaughter, the trial court erred in refusing to give defendant's tendered instruction number 9, a definition of battery.

■■ The test for determining the propriety of an instruction on a lesser offense is the two-step analysis discussed in *Lawrence v. State*, (1978) 268 Ind. 330, 375 N.E.2d 208. The first step involves examining the statutes involved and the charging information, while the second involves examining the evidence. Both steps must be satisfied before an instruction is proper. *Roddy v. State*, (1979) Ind.App., 394 N.E.2d 1098. In the present case, the defendant failed to pass the first step. In *Jones v. State*, (1982) Ind., 438 N.E.2d 972, we held that "the state through its drafting can foreclose as to the defendant, the tactical opportunity to seek a conviction for a lesser offense. The point is that absolute discretion rests in the state to determine the crime(s) with which a defendant will be charged." *Id.*, 438 N.E.2d at 975. The information in this case charged that:

> "On or about the 7th day of September, 1981, in Huntington County, in the State of Indiana, Shawn Lynn Sills did knowingly or intentionally kill another human being, Mary Haines, by striking and beating at and against the body of the said Mary Haines with his fists and did then and there and thereby cause said Mary Haines to die.
>
> "All of which is contrary to the form of the Statute in such cases made and provided, to-wit: Ind.Code 35–42–1–1 and against the peace and dignity of the State of Indiana."

It is clear that the state sought only to charge for murder. The defendant cannot inject the lesser offense, since this would allow the jury to return a compromise verdict. *Jones v. State; Hester v. State*, (1974) 262 Ind. 284, 315 N.E.2d 351. It was

not error to refuse defendant's tendered instructions numbers 5 and 9.

Defendant's tendered instructions numbered 6, 7, and 8 all related to the defense of intoxication. The defendant concedes that the legislature in 1980 limited the use of the voluntary intoxication defense to cases where it negates an element of an offense referred to by the phrase "with intent to" or "with an intention to." Ind.Code § 35–41–3–5 (Burns 1983 Supp.). Since the crime of murder does not contain the necessary words, Ind. Code § 35–42–1–1 (Burns 1979 Repl.), voluntary intoxication is not a defense. The defendant, however, relies on *Hughes v. Mathews,* (7th Cir.1978) 576 F.2d 1250, in support of his contention that the trial court should have given the instructions. *Hughes* involved a challenge on a writ of habeas corpus to Wisconsin's rule of excluding all psychiatric evidence in the guilt portion of a bifurcated trial. The petitioner had been tried in a Wisconsin court for the first-degree murder of his wife and neighbor. Hughes's defense was that he lacked the specific intent necessary for first degree murder. The only evidence the defendant offered to show lack of intent was the testimony of a psychiatrist. Under Wisconsin's bifurcated system, however, psychiatric evidence was admissible in the insanity portion of the case but not in the guilt portion. Furthermore, Wisconsin had a rebuttable presumption that the defendant intended the probable consequences of his acts. The Seventh Circuit Court of Appeals held that the rebuttable presumption coupled with evidentiary prohibition unconstitutionally relieved the prosecution of proving the intent element of the crime.

In the present case, the refusal to allow instructions on intoxication did not, as the defendant asserts, relieve the state from proving the intent element. As noted in *Muench v. Israel,* (E.D.Wis.1981), 514 F.Supp. 1194, "the only defense defendant [in *Hughes*] offered at trial went to the issue of proving his lack of intent. The only evidence on lack of intent he offered was the testimony of the psychiatrist. Ex-

cluding that testimony, therefore, precluded the defendant from raising any defense as to intent." *Id.,* 514 F.Supp. at 1197. Thus a conclusive presumption was created in the *Hughes* trial. No such presumption was created in the present case. The defendant's defense on specific intent was not limited to intoxication. The defendant also presented evidence on insanity, including testimony that the defendant did not recall actually killing the victim and testimony of psychiatrists that the defendant was psychotic. The state was therefore still required to prove intent beyond a reasonable doubt, and they were not relieved of this duty by the trial court's refusal to give instructions on intoxication. Under the circumstances of this case, circumstances significantly different from those in *Hughes,* no conclusive presumption of intent existed. Since intoxication is only a defense in crimes involving an element with the words "with intent to" or "with an intention to," and since no element of murder contains these words, it was not error to refuse to give defendant's tendered instructions numbered 6, 7, and 8, all dealing with intoxication.

The defendant's last contention on the issue of instructions is that the trial court erred in refusing to give defendant's tendered instruction number 11, which stated:

"Members of the Jury, you are not to consider any sentence which might be imposed as a result of these proceedings. Sentencing, if any, is the function of a later proceeding, if required."

We agree with the state that this was not entirely a correct statement of law. The court is responsible for sentencing. Ind. Code § 35–50–1–1 (Burns 1979 Repl.). The above instruction, however, leaves the jury with the impression that they might be called upon to render a sentence. The trial court was not in error in refusing to give the instruction. *Richey v. State,* (1981) Ind., 426 N.E.2d 389.

## VIII.

The defendant lastly contends that the sixty-year sentence was manifestly un-

reasonable. Under Ind.R.Ap.Rev.Sen. 2, a sentence is not manifestly unreasonable unless no reasonable person could find the sentence appropriate to the particular offense and offender.

The trial judge made the following findings when sentencing the defendant:

"The Defendant, Shawn Lynn Sills, having been found guilty of the crime of Murder by the jury and the Court having adjudged the defendant guilty of the crime of Murder now sentences the defendant to the Indiana Department of Corrections for a period of forty (40) years and having considered the mitigating and aggravating circumstances imposes an additional twenty (20) years making a total of sixty (60) years. The Court finds that the mitigating circumstances to be considered were that the fact that the defendant was drinking. There was a conflict in evidence as to how drunk the defendant was and how much he had drank. The court also finds that two psychiatrists did indeed find that the defendant was insane at the time. However, the court again finds that there was contradicting and conflicting evidence on the question of the defendant's sanity. The Court also finds that there was evidence of the fact that the defendant had suffered a diminished capacity but again the court finds that the evidence was conflicting on that fact. The Court does find that the defendant comes from a family of which the father was alleged to have been and there was evidence to establish that he was alcoholic and that the fact that the defendant was abused physically. The Court further finds as possible mitigating circumstances that the defendnat [sic] did engage in or was at the time perhaps under the influence of alcohol and drugs but again there was conflicting evidence as to how much and how much under the influence the defendant was. Certainly as a mitigating circumstance the court finds that the defendant is 16 years of age.

"As aggravating circumstances the court finds that this crime was committed while the defendant was on parole and and [sic] that in fact he had violated his parole. The Court further finds that the defendant has a history of criminal activity commencing in 1975 wherein he was found to be involved in vandalism that occurred on July 10, 1975. Again on July 23, 1979 the defendant was involved in two different types of burglary.... Again on April 2, 1980 and again on the 15th of June, of 1980. The Court finds that the defendant was sent to the diagnostic unit of the Indiana Boy's School in September 15, 1980 and following the report from the diagnostic unit the defendant was placed in the Gibault Home near Terre Haute, Indiana on November 16, 1980. the [sic] court received four separate reports one on 12-9-80, another on 1-26-81 another on 2-9-81 and another on 2-17-81 from the boys' school showing that the defendant was unable to conform to the rules and was involved in fighting and other violations at the boy's school. Then on 2-17-81 the defendant was discharged from the Gibault Home and on February 20, 1981 the defendant was sent to Indiana Boys School. The defendant was parolled [sic] from Indiana Boys School on June 19, 1981. as [sic] an additional aggravating circumstances the court finds that the defendant is in need of correctional treatment that can best be provided by commitment to a penal facility. The Court finds that imposition of a reduced sentence would tend to depreciate the seriousness of the crime in which the defendant was involved in. The Court finds that the victim of the crime was over 65 years of age in fact she was 82 years of age. Court further finds that the victim of the crime was physically infirm.

"The Court finds that the victim was brutally beaten to death at the hands of the defendant. The Court finds that the defendant has lacked remorse as demonstrated during the trial of this cause. The Court further finds that the aggravating circumstances outweigh the mitigating circumstances and thus imposes

the standard sentence of 40 years and aggravates the sentence for 20 additional years."

We feel that the trial judge fully considered the aggravating and mitigating circumstances of the case and stated his findings with commendable detail. We cannot say that no reasonable person could have found the sentence appropriate. As such, the sentence is not manifestly unreasonable.

For all the foregoing reasons, there was no reversible trial court error, and the judgment of the trial court should be affirmed.

Judgment affirmed.

DeBRULER, J., concurs.

GIVAN, C.J., concurs in result with opinion in which PIVARNIK, J., concurs.

PRENTICE, J., dissents with opinion.

PRENTICE, Justice, dissenting.

I dissent to the majority's opinion with respect to issue six, i.e., whether it was error to admit into evidence certain diagnostic reports concerning the Defendant's mental state.

The Defendant presented insanity as his defense. In rebuttal, the State offered the expert testimony of Dr. Norman Duly, a psychiatrist. In addition to interviewing the Defendant, Dr. Duly had utilized a number of documents and reports which had been prepared by others in forming his opinion. Three of these reports were offered by the State and admitted into evidence over Defendant's "hearsay" objection.

The first report, State's Exhibit #20, was a report of an electroencephalogram (EEG) examination of the Defendant. This exhibit had little prejudicial or probative value, and any error in its admission could be considered harmless. The second and third exhibits, however, State's Exhibits #21 and #22, were diagnostic evaluations of the Defendant. They contained subjective evaluations of his family, school and social attitudes, as well as the conclusions

and opinions of the preparers. The information in these reports had been acquired through interviews with his family members and probation officer.

The reports had not been prepared in connection with this case; rather, they had been prepared in connection with Defendant's incarceration in the Indiana Boys School and more than one year prior to the murder. None of the individuals who had prepared the reports testified at the trial. The majority holds that these reports were not hearsay but were properly admitted not to prove the truth of the matters asserted therein, but merely to establish a foundation for Dr. Duly's opinion with regard to the Defendant's sanity. I cannot accept this analysis.

Dr. Duly gave absolutely no testimony concerning which, if any, of the test results he had considered to be relevant to his inquiry or which, if any, of the facts related he had utilized in forming his opinion before the documents were admitted into evidence. Indeed, the State's entire foundation for admitting these two exhibits was the identification by the Doctor as reports that he had read while conducting his evaluation of the Defendant's mental health. Upon this pretense both exhibits were admitted in their entirety. No attempt was made to delete those portions of the reports which were clearly inadmissible. Thus, upon no more than a mere identification by Dr. Duly, highly prejudicial statements were admitted into evidence and passed among the jurors.

In State's Exhibit #21 the following opinions appeared:

"Shawn appears to be harboring an awful amount of hate and resentment. The hate appears to be the result of his father's treatment of him. . . . His father, according to Shawn, has also stated that he would like to put a gun to Shawn's head and kill him. This agent is not as much concerned about the accuracy of these statements, as she is with the emotions that Shawn expressed while revealing them.

"Shawn has talked about both suicide and homicide (concerning his father)." (R. at 839) (State's Exhibit # 21 at 4).

State's Exhibit # 22 contained results from a number of personality tests, followed by the examiner's impressions, opinions and recommendations:

"He seemed to vacillate between wanting to tell his story and therefore relieve some of the mounting tensions, and his fear that by revealing himself he would both lose control and jeopardize his future stability in the home.

\*      \*      \*      \*      \*      \*

"Personality testing suggests that Shawn was feeling a great deal of stress and pressure at the time of testing and therefore probably exaggerated all his feelings, worries and complaints.... Shawn probably has a high energy level combined with a low frustration tolerance, easy irritability, moodiness and lack of sufficient appropriate outlets for the excess energy.

\*      \*      \*      \*      \*      \*

"Shawn impressed this examiner as an extremely unhappy youth who has learned to protect himself from hurt and rejection by converting all unpleasant feelings to anger.... resulting in a figurative 'powder keg'—an unpredictable individual who may rather intensely overreact (sic) to a minor threat or irritation." (R. at 840) (State's Exhibit # 22 at 2–3).

While Dr. Duly could state his opinion and support it with facts from these reports, he certainly would not have been allowed to testify as to the opinions of those persons who had prepared them. *Flewallen v. State*, (1977) 267 Ind. 90, 96, 368 N.E.2d 239, 242; *Clouse v. Fielder*, (1982) Ind.App., 431 N.E.2d 148, 155. *Cf. Duncan v. George Moser Leather Company*, (1980) Ind., 408 N.E.2d 1332, 1343. Yet, by having Dr. Duly identify them as matters he had considered, the State was allowed to place these opinions directly into evidence and pass them among the jurors to be read. The State's questioning of Dr. Duly appears to me to have been mere subterfuge aimed at exposing the jury to inadmissible hearsay opinions. *Weedman v. State*, (1981) Ind., 416 N.E.2d 1268, 1269; *Flewallen v. State*, 267 Ind. at 96, 368 N.E.2d at 242. *Cf. France v. State*, (1979) 179 Ind.App. 659, 664, 387 N.E.2d 66, 69; *Smith v. State*, (1972) 259 Ind. 187, 189, 285 N.E.2d 275, 275–76, *cert. denied* 409 U.S. 1129, 93 S.Ct. 951, 35 L.Ed.2d 261.

The majority opinion misinterprets *Smith.* In *Smith* we were not presented with the question of whether or not a report was admissible directly into evidence. Nevertheless, we stated that, "medical reports containing observations and expert opinions relating to a defendant's sanity or insanity *should not* be admitted directly into evidence...." 259 Ind. at 189, 285 N.E.2d at 275–76 (emphasis added). Although this statement was dicta in that case, it has subsequently been accepted by this Court and the Court of Appeals as a correct statement of the law excluding medical reports of the type involved in this case from admission into evidence. *Weedman v. State*, 416 N.E.2d at 1269; *Flewallen v. State*, 267 Ind. at 96, 368 N.E.2d at 292; *Clouse v. Fielder*, 431 N.E.2d at 155.

In *Weedman* we held that the trial court did not err in refusing to admit Defendant's offered medical record into evidence:

"The defendant contends that the trial court erred in refusing to admit his medical records into evidence. The defendant interposed an insanity defense. The medical record originated from a mental health center in Kentucky, where the defendant had received treatment. It contained the conclusion of a person, who is not identified in the record, that the defendant suffered from a schizoid personality.... [T]he defendant attempted to bring a medical record containing an observation about his sanity or insanity directly into evidence, which we have stated should not be done. *Smith v. State*, (1972) 259 Ind. 187, 189, 285 N.E.2d 275, 55 A.L.R.3d 546, *cert. denied*, (1973) 409 U.S. 1129, 93 S.Ct. 951, 35 L.Ed.2d 261.

There was no error in failing to admit the medical record."

416 N.E.2d at 1269.

In *Flewallen* the trial court permitted an expert witness to read into evidence an entire medical report of another doctor, including the diagnosis. We held that to be error, although harmless under the circumstances. Citing *Smith v. State,* Justice Pivarnik wrote:

"While an expert opinion as to the defendant's mental condition by a person not available for cross-examination is not admissible testimony, such report may be used as a basis of a testifying expert's opinion as to the defendant's sanity if it is in a form that he would normally use in making his professional evaluation. *Smith v. State,* (1972) 259 Ind. 187, 285 N.E.2d 275, *cert. denied* 409 U.S. 1129, 93 S.Ct. 951, 35 L.Ed.2d 261 (1973). It was improper for the court to permit Doctor Pontaoe to read the entire report including Doctor Tullen's diagnosis."

*Flewallen,* 267 Ind. at 96, 368 N.E.2d at 242.

These cases, *Weedman, Flewallen* and *Smith* have established a sound evidentiary rule in Indiana, i.e., medical records containing observations, interpretations, diagnoses or opinions of one who is not available for cross-examination are not admissible directly into evidence. The majority opinion today would eliminate this rule.

These reports, State's Exhibits # 21 and # 22, were erroneously admitted into evidence and contained highly prejudicial matter. The judgment of the trial court should be reversed and the case remanded for a new trial.

GIVAN, Chief Justice, concurring in result.

I concur in the result of the majority, but would point out that I do not agree with the language used by the majority in disposing of the question raised by defendant's tendered instructions numbered 6, 7 and 8.

Although in 1980 the legislature did pass IC § 35–41–3–5(b), which provides:

"(b) Voluntary intoxication is a defense only to the extent that it negates an element of an offense referred to by the phrase 'with intent to' or 'with an intention to.' " [IC 35–41–3–6, as added by Acts 1976, P.L. 148, § 1; 1977, P.L. 340, § 11; 1980, P.L. 205, § 1.]

I believe the statute to be an anomaly in legal language. Apparently the legislature wrote this amendment to the statute in response to our holding in *Williams v. State,* (1980) 273 Ind. 105, 402 N.E.2d 954.

Although the Court of Appeals has rendered a decision much the same as the majority in this case, in holding that the words in the statute "with intent to" or "with an intention to" are not contained in the robbery statute, *Smith v. State,* (1982) Ind.App., 441 N.E.2d 984, I believe that interpretation to be unreasonable, and not in keeping with past cases on statutory interpretation.

The murder statute, the same being IC § 35–42–1–1, reads in pertinent part as follows:

"A person who:

(1) Knowingly or intentionally kills another human being; ...."

To hold that this statute does not contain the language required in the voluntary intoxication statute, to me is a strain of statutory interpretation. The murder statute clearly requires an intentional act on the part of the perpetrator. To interpret the statute to require the specific language that is contained in the quotes of the statute is to make the statute ludicrous indeed. This I would not do.

However, I have a more fundamental disagreement with the majority opinion in this regard, in that I feel the statute is wholly unworkable in its total concept. It is fundamental in criminal law that there is no such thing as a crime without a *mens rea.*

In some cases courts have, while acknowledging the necessity of *mens rea,* discussed what they term "strict or absolute criminal responsibility." *See Smith v.*

*California,* (1959) 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205; *Noble v. State,* (1967) 248 Ind. 101, 223 N.E.2d 755. *See also* Hall, *Ignorance and Mistake in Criminal Law,* 33 Ind.L.J. 1 (1957). However, it is submitted that a close examination of these cases leads one to believe the so-called "strict responsibility" is not responsibility devoid of *mens rea,* but rather an implied *mens rea.*

*Smith v. California, supra,* cites *United States v. Balint,* (1922) 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604, for the proposition that a state may impose strict liability, i.e. no intent needed in food and drug cases. However, in so holding the court first recognized the general rule that scienter was a necessary element of every crime, but then observed an exception in certain cases "under statutes the purpose of which would be obstructed by such requirement." *Id.* at 252, 42 S.Ct. at 302, 66 L.Ed. at 605. Here again, upon reading the entire opinion, the court appears to really be recognizing the practical necessity of implying intent rather than holding it totally unnecessary.

I would take the position that every crime requires intent of some sort. In a crime like murder the intent must be to kill a human being. In a crime like involuntary manslaughter the intent to commit an unlawful act is the intent that is required. Some authors have gone so far as to say that crimes that were *malum in se* required intent, whereas crimes that were *malum prohibitum* did not require intent. *See Gregory v. State,* (1973) 259 Ind. 652, 655, 291 N.E.2d 67, 68; *Sewell v. State,* (1983) Ind., 452 N.E.2d 1018, 1020.

The mere fact that a crime is *malum prohibitum* does not obviate the necessity of the presence of intent. The situation is that when a matter is *malum prohibitum,* such as traffic laws, intent to violate the statute will be presumed from the action of the defendant. For instance, a court will not entertain the claim of a defendant who has been accused of running a traffic light that he did not see the light. He is charged with the responsibility of seeing the light and his actions will give rise to the presumption of this intent.

This is clearly demonstrated in the *malum in se* crime of murder, where we will imply intent and malice from the use of a deadly weapon in a manner calculated to inflict personal injury on a human being. In either case, the presumption of intent, although raised .as a matter of law, is in fact rebuttable.

In the traffic light situation where the defendant admits he was totally *compos mentis* as he drove through the red light, but merely claims he neglected to see it, his intent will be implied from his action. However, let us suppose that the defendant states, and can readily prove, that he was proceeding down the street in a lawful, attentive manner, but as he approached the light a small child playing at the side of the road threw a rock through the window of his car, striking him in the head and rendering him unconscious. While he was unconscious his car proceeded down the street and passed through the red traffic light. One would hope there is no judge on the bench in Indiana who would hold that the defendant nevertheless had passed through the light, although he was in a state of unconsciousness, and that he was therefore guilty of running a red light. Such a decision, of course, would be ludicrous to the extreme. However, this example serves to demonstrate that even in the running of a red light intent is a necessary element even though that intent may be implied in certain instances.

This brings us to the proposition in the case at hand wherein the majority holds that intoxication is a defense only in cases where the phrases "with intent to" or "with an intention to" appear in the statute. Although this is the exact language of the statute above quoted, it poses an impossible situation in criminal jurisprudence. In order to form intent in any event the perpetrator must be acting consciously and competently. Any situation which renders the perpetrator incapable of forming intent frees him from the responsibility of his acts. Again, I refer to the hypothetical

above cited concerning the driver of the automobile who is struck in the head by a rock and while unconscious passes through a red light in an intersection.

Similarly, if a completely *non compos mentis* inmate of a mental hospital managed to escape his guards, acquire a motor vehicle and speed into the traffic of the city, thereby violating one or more traffic laws, he of course could not be prosecuted because he is *non compos mentis*, not only incapable of standing trial, but also incapable of forming the intent to commit the act whether it be an act of *malum in se* or *malum prohibitum.*

Likewise, if intoxication, whether it be voluntary or involuntary, renders that individual so completely *non compos mentis* that he has no ability to form intent, then under our constitution and under the firmly established principles of the *mens rea* required in criminal law, he cannot be held accountable for his actions, no matter how grave or how inconsequential they may be.

In appellate cases, we also find a confusion in terminology with the uses of the words "general intent" and "specific intent." In Black's Law Dictionary 727 (5th ed. 1979), we find the definition given for "general intent" to be: "In criminal law, the intent to do that which the law prohibits. It is not necessary for the prosecution to prove that the defendant intended the precise harm or the precise result which eventuated." Under the definition of "specific intent", we find: "In criminal law, the intent to accomplish the precise act which the law prohibits; e.g. assault with intent to rape." We go back up to the top of that column on page 727 and we find within the definition of the word "intent", *inter alia,* "A mental attitude which can seldom be proved by direct evidence, but must ordinarily be proved by circumstances from which it may be inferred." Further we find: "A state of mind existing at the time a person commits an offense and may be shown by act, circumstances and inferences deducible therefrom."

When we turn in the same dictionary to page 1254, we find the definition of the word "specific" to be: "Precisely formulated or restricted; definite; explicit; of an exact or particular nature." It thus becomes apparent that to use the word "specific" in front of the word "intent" is to inject an unnecessary word. When speaking of intent so far as the working of the human mind is concerned, we are speaking of a specific mental process. When we say an actor had intent to do a certain thing, we add nothing whatsoever to the meaning by saying he had specific intent to commit the act.

On the other hand, what do we add when we add the word "general" to the word "intent"? To say that the person had general intent to commit some sort of act is not to say that he did not have specific intent, but is merely to say that we will imply "specific" intent from the nature of his acts. Thus, in the last few years, a state of confusion has been brought about by the use of inaccurate terminology.

In his book *General Principles of Criminal Law* (2nd ed. 1960), Professor Jerome Hall observes on p. 142:

"The current confusion resulting from diverse uses of 'general intent' is aggravated by dubious efforts to differentiate that from 'specific intent.' Each crime, as Stephen pointed out, has its distinctive *mens rea,* e.g. intending to have forced intercourse, intending to break and enter a dwelling-house and to commit a crime there, intending to inflict a battery, and so on. It is evident that there must be as many *mentes reae* as there are crimes. And whatever else may be said about an intention, an essential characteristic of it is that it is directed towards a definite end. To assert therefore that an intention is 'specific' is to employ a superfluous term just as if one were to speak of a 'voluntary act.' It follows also that if some intentions are to be distinguished from others, the criteria selected to do that must be coherent with the specificity of all intentions. This provides one guide to a critical reading and improvement of current professional discourse in terms of 'general intent' and 'specific

intent.' Insofar as these terms are used to refer to actual intentions, both of them are unfortunate, and the adjectives should be discontinued."

There is the element of intent which must be present in every crime. Sometimes intent can be directly proved by the actions or utterances of the perpetrator. However, as correctly stated in *Black's Law Dictionary*, referred to above, (intent) "must ordinarily be proved by circumstances from which it may be inferred." To be accurate in the use of the english language, the intent in the mind of the perpetrator in either event is "specific." In neither event is it "general" whatever that may mean. In either situation we are merely speaking of the manner in which the state proceeds to convince the trier of fact that "intent" existed in the mind of the perpetrator.

I would therefore hold that in any crime the prosecution must fail if there is, in fact, a lack of intent, and that the inability to form intent may be demonstrated by various conditions of the mind including intoxication to the extent that intoxication has rendered the perpetrator *non compos mentis*.

I would hold that IC § 35–41–3–5(b) is unconstitutional under *Smith v. California, supra,* and further that it violates the equal protection clause of the constitution in that it affords different defenses to persons in like circumstances.

I would overrule the cases that have attempted to follow and implement the statute.

PIVARNIK, J., concurs.